UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMIBA

IN THE MATTER OF THE SEARCH OF:   )
                                  )
THE PREMISES LOCATED AT           )
3640 Veazey Street NW             )
Washington, DC 20008              )
                                  )
                                  )

Case: 1:18–sw–00003
Assigned To : Magistrate Judge Robinson, Deborah A.
Assign. Date : 1/5/2018
Description:  Search and Seizure Warrant

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE .

I, Laura R. Calvillo, being first duly sworn, herby depose and state as follows:

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 3640 Veazey Street NW, Washington, DC 20008, hereinafter "Subject Premises," further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation and have been since March of 2016.  I am currently assigned to the Washington Field Office, Northern Virginia Resident Agency.  Prior to joining the FBI, I was a Special Agent for the U.S. Army Criminal Investigation Division, and I investigated violations of federal law involving child pornography and the sexual exploitation of children.  As an FBI Special Agent, I investigate federal violations concerning child pornography and the sexual exploitation of children.  I have gained experience through training and work related to conducting these types of investigations.

3.      As a federal agent, I am authorized to investigate violations of laws of the United States and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

1

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## DEFINITIONS/TECHNICAL TERMS

5.      Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with

2

the use of an encryption key, which specifies how the message is to be encoded. Any adversary that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

d.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

e.      "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

f.      "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

g.      "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and

includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. § 1030(e)(1).

h.     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

i.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

4

j.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

k.      "Computer-related documentation" means written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

l.      "Domain Name" means the common, easy-to-remember names associated with an Internet Protocol address. For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Internet Connection" means a connection required for access to the Internet. The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

n.      "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

o.      "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

p.      A "modem" translates signals for physical transmission to and from the Internet Service Provider, which then sends and receives the information to and from other computers connected to the Internet.

q.      A "router" often serves as a wireless access point and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. The router is in turn typically connected to a modem.

6

r.      "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

s.      "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

t.      "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

u.      "Wireless network" as used herein means a system of wireless communications in which signals are sent and received via electromagnetic waves such as radio waves. Each person wanting to connect to a wireless network needs a computer which has a wireless network card that operates on the same frequency. Many wired networks base the security of the network on physical access control, trusting all the users on the local network. But, if wireless access points are connected to the network, anyone in proximity to the network can connect to it. A wireless access point is equipment that connects to the modem and broadcasts a signal. It is possible for an unknown user who has a computer with a wireless access card to access an unencrypted wireless network. Once connected to that network, the user can access any resources available on that network to include other computers or shared Internet connections.

v.     "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes digital files, resulting in a 160-bit value that is unique to that file. It is computationally infeasible for two files with different content to have the same SHA 1 hash value. By comparing the hash values of files, it can be concluded that two files that share the same hash value are identical with a precision that exceeds 99.9999 percent certainty. There is no known instance of two different child pornographic images or videos having the same SHA1 hash value.

w.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to set up files on a computer to be shared with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.    One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network. However, a tool used by law enforcement restricts the download so that the file is downloaded, in whole or in part, from a single user on the network.

1.     When a user wishes to share a file, the user adds the file to his a shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's SHA 1 has value is recorded by the

8

P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

2.      Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

## PROBABLE CAUSE

6.      Leading up to Tuesday, January 2, 2018, a detective with the Metropolitan Police Department ("UC") was acting in an undercover capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation ("MPD-FBI") Child Exploitation Task Force operating out of a local office in Washington, D.C.  Prior to that date, the UC had posted numerous online bulletin messages on specific social media forums, which, based on the UC's experience and information gathered from other sources, are websites that are frequented by individuals who have a sexual interest in children and incest. The bulletin messages were intended to attract individuals with a sexual interest in children. Your affiant would respond to certain messages or post messages on these public forums and provided his "KIK" account screen name.[1]

7.      On Tuesday, January 2, 2018, at approximately 6:32 a.m. EST, an individual using the KIK screen name, "eagle8310," subsequently identified as the defendant, Jordan Adler, sent the UC a private message via KIK instant messenger stating, "Hey there, Im in DC into little ones too."[2] During the course of the chat, the defendant stated that he was a 20-year-old college student

---

1 "KIK" refers to KIK messenger, a free mobile application that permits users to send text messages and other content, including videos and images.
2 All text abbreviations and typographical errors included in quoted text language are original.

residing in Adams Morgan, Washington, D.C. The following is a portion of the initial KIK exchange between the defendant and UC:

Defendant: Hey there, Im in DC into little ones too

UC: Hey dad here with little girl. You?  Im in DC too moved here from VA after divorce.

Defendant: Nice, that means your close. Any chance you'd be willing to let me play with her with you there?

UC: Maybe. Need to build some trust. She is 8 not sure if that is too young or not.

Defendant: That's the perfect age for me. And I understand. Im a college student here.

UC: Ok cool I live in NW where the caps and wizards play. You?

Defendant: I live in NW too, near AdMO. Very close by [emoticon]

UC: [emoticon] What is your schedule like? I have shared custody. Are you sure your real and not a cop or trap?

Defendant: Free most days, especially if you have her the next few days or weekends. I can come over whenever. I promise I'm not haha.

UC: Ok Cool. I will have her tomorrow unless my ex acts like a bitch in will know by tomorrow mid morning. U have any exp at all. What are u looking to do Im not fully active with her.

Defendant: Sounds good. And Ill be slow and gentle at first, looking to maybe play with her pussy, touch her tits, maybe put some of my cock inside her.

UC: Ok Im good with all that. How do I know yours safe?  Like as in cool

Defendant: I promise you I am. I wanted to play with a girl for a long time.

UC: Just don't want to get in trouble. U have any experience at all with young?

Defendant: You'll see me tmrw and know Im real. Yes I do my little cousin.

UC: Mmmmm what does she look like?

Defendant: She is a cute little blond. [emoticon] No pic of her on my phone sadly. Got s pic of your girl?

UC: Yes. What kind of pics u have?

Defendant: Very young dB links

UC: Mmmmm. Nice love very very yng [emoticon]. What's the best link u have?

Defendant:   Involves toddlers ;)

8.      The defendant then sent the UC via KIK messenger to the UC's cellular phone a video file that is two minutes in length.  The video depicts a toddler girl that appears to be approximately two years of age being vaginally penetrated by an adult male penis.  The toddler is crying and screaming throughout the video as she is being sexually assaulted by the adult male. The KIK chat then continued as follows:

UC: Mmmmmm fuck yeah. Love that

Defendant: Can I see her now?

UC: Yes

Defendant: And you'd be there watching right?

UC: Yes. Love the vid so hot !

9.      The UC sent the defendant two images of his purported daughter, one exposing her abdomen and chest and one depicting the purported child wearing a pink shirt, with a note containing the date next to her.  The images did not depict a real child. The chat then continued as follows:

UC: Just so u know Im real. Took that this morning before school.

Defendant: Mmmmm I bet you can't wait for me to slip my cock inside of her.

UC: Mmmm yes can't wait

Defendant: Will you join me in fucking her?

UC: Yes for sure! Cant wait to see her with another cock. How old is cousin?

Defendant: A thick college cock. ;) She is 8 too! So I know her age pussy well....I've cum insider her actually when asleep.

10.     The defendant and the UC continued to chat via KIK messenger about the logistics of a meeting, during the course of which the defendant and the UC arranged to meet at a bar in Washington D.C. near the UC's purported home.   During the course of the discussion, the defendant asked, "Could I see your cock next to her maybe?" to which the UC responded, "I don't have any like that but like a said once I know your real and cool with it Ill face time and have her finger herself before we walk up. Is that cool? Im 33 you?"  The defendant indicated, "I'm 20. That works Just don't want to be busted lol."  The defendant continued pressing for an image as follows:

Defendant: Pussy pic?

UC: Looking forward to it.  Let me look I don't think so I try to be careful with that. What else you have?

Defendant: Trust me I'm a college boy looking for young girls you have nothing to fear. I have many links.

UC: ... [sends an image of his purported child lying facedown on a bed.  The image did not depict a real child]...

Defendant: ... Any of her pussy tho.

12

11.     After further discussion, the defendant stated that he would "bring a few" videos of child pornography with him to the meeting with the UC.  Later that afternoon, the KIK chat resumed:

Defendant: Sounds good. Would you let me cum inside he. Her

UC: Yes so long you are DDF.

Defendant: Of course, completely clean.

UC: Ok cool no worries. If your taking Metro the closest to me is gallery place.

Defendant: Ok perfect. Does her pussy get wet?

UC:  Yes but not fully.

Defendant:  That's okay.  I'll make sure to bring some lube.

UC:  Cool.

Defendant:  I can't wait to play with her little tits too.  Is her clit sensitive yet?

12.     After indicating he was "so excited to fuck her," the defendant resumed discussing logistics of a meeting with the UC.

13.     On January 3, 2018, the defendant re-initiated contact with the UC via KIK instant Messenger. The following is a portion of that chat:

Defendant: Hey can I see a face pic of yours? Just so I know who you are when we meet.

If we could FT and you show me her pussy and your face that would be amazing. I'm really

looking forward to seeding your daughter.

UC: Hey. Im looking forward to today!

Defendant: Same here! Im gonna fuck that pussy so good, so deep. Her cherry popped?

UC: Yes but tight as hell

Defendant: Any chance you can Face Time beforehand and you can show me yourself with her? Nervous about getting caught naturally. But I want that pussy so badly. I wanna fuck her and seed her with my warm cum.

UC: Me to I have the most to lose here lol.

Defendant: That's true haha

UC: Big risk for me that's why I want to be careful, got nervous when u said u wanted to see face but I understand. Maybe we can do a live pic, can u hold up 2 fingers in front of face and I'll hold up what u tell me to.

Defendant: I sent you violent Yung vid I think you're fine. ;)

14.     Subsequently, UC and defendant exchanged images of themselves. The defendant requested that the UC send a picture of himself making a, "rock and roll sign," with which the UC complied.  The UC requested that defendant send an image of himself holding up two fingers in front of his face. The defendant complied and sent and image of himself holding up two fingers exposing half of his face. The defendant also sent an image of his penis.  The defendant stated, "this thick meat wants her so bad." The defendant continued asking the UC questions about his purported daughter, including whether the defendant's "cock" is "good for her?" and the size of the UC's penis. The defendant stated that he would be arriving to the prearranged met location via Metro. The chat continued as follows:

Defendant: Nice man. So horny for this to happen. If you could send a pussy pic after she gets home I'd love that.

UC:  That won't be till we meet so I know for sure your serious.  I may have some of her in my gallery though. Can u bring your other good porn with very yng, so we can put it on for her?  I think that is a fair de3al since I'm letting u okay with her.

14

Defendant: That'd be great. And yes I will. I'll bring a lot. If you have some in the gallery that'd be ideal.

UC: Ok cool.

Defendant: Does she have any limits?

UC: Just no fucking her in ass finger is ok though

Defendant: Does she suck good cock?

UC: Oh yeah.

Defendant: I'm hard just thinking about her.

...

15.     The defendant then asked the UC if he had any pictures of his daughter's "pretty little pussy?" The defendant commented that the UC's purported daughter has a "tight body, can't wait to slip it in and seed her." After further discussing the child, the defendant stated, "I may have to fuck her multiple times... Make this a regular thing." During the course of the chat the defendant stated that he would bring his collection of child pornography with him to the meet. Initially the defendant stated that he would bring his child pornography on a thumbdrive, but later stated that he would send the links to the UC once he arrived, stating that he wanted to, "play it safe." The defendant stated that "some of the shit I have is pretty brutal. ☺" The UC responded, "Mmmmmm I REALLY love that, so bring it but we can go slow with her with some tame kiddy stuff" to which the defendant stated, "Eventually wanna introduce some pervy brutal stuff. ☺"

16.     After further discussion about the defendant's planned sex acts and the logistics of the meet, the chat continued as follows:

Defendant: ...I hope she's ready to fuck today. I'm so horny I'm gonna cum loads inside her pussy.

UC: Yes she will be, I think I have some lube at house but it may be wise to bring some. And don't forget the porn, I wanna have that on while u play with her.

Defendant: Ill start slow but Im going fuck her hard as fuck. Really getting deep in that young cunt. Thank you for letting me use your daughter as my cum dump.

UC: Yes no problem.

Defendant: I hope she can take it all. Are you gonna cum in her too?

UC: Yes for sure Ill let you go first.

Defendant: I'm pretty nervous. Hope this isnt a sting.

UC: Im nervous as fuck… couldn't hardly eat.

Defendant: It'd help a lot if I can see you with her pussy, that way I know for sure. But I get the Face Time thing. And I want her so badly.

UC: Yeah I feel comfortable with the Face Time.

Defendant: Maybe before we even meet you can Facetime me with her and show her pussy? Just to make sure.

17.     Later that afternoon, after further discussion about the terms of their meeting and their nervousness about not getting caught, the defendant indicated he was close to the planned meeting point, stating:

Defendant: 15 minutes away.

UC: Oh cool

Defendant: Yeah very close by

UC: Sweet

Defendant: I really can't wait Im so excited for her!! And you get her everyday. Lucky

UC: Not everyday but a lot lol

16

Defendant: She needs to see this violent porn.

UC: Mmmmmmmmmmm. Fuck yeah. I have a dell laptop, is your thumb drive close compatible.

18.     The defendant and the UC continued to discuss via KIK messenger the logistics of the defendant providing additional child pornography to the UC. The defendant also stated, "She'll remember my dick forever" and inquired whether the child "like[s] piss." The defendant stated "we'll get by with just fucking then! I can't wait to put that little clit on my tongue...She's going to need to take my whole cock tho man." The defendant stated, "God I feel nervous Im terrified. How do I know this is for real?? Im almost there."

19.     The defendant parked a block away from the original meet agreement and asked the UC to meet him at his vehicle. The defendant provided specific details about where he was parked and stated that he meant to park closer to the meet location. The defendant and the UC went back and forth via KIK whether the UC would come to the car or the defendant would come to the UC's location on the block outside the car, approximately one block away. After the defendant provided the specific details and a photograph of the location he was in one block from the UC's location (the planned meet location), the defendant, still in his car, was blocked in by an unmarked police cruiser with police lights. Agents approached the defendant and identified themselves, and asked the defendant to open his car door. The defendant appeared shocked and was observed fumbling with his phone. The defendant did not comply opening the door, so agents opened it through an open window and placed the defendant under arrest. The defendant's phone was seized on the scene. The defendant produced a New Jersey Driver's License bearing his name, Jordan Adler.

20.     The defendant initially waived his <u>Miranda</u> warnings and provided a brief statement to law enforcement. He acknowledged that he communicated with the UC via KIK messenger and sending the video of child pornography to the UC. The defendant denied knowing the contents of the video. Defendant stated only saw a thumbnail of the video. And the thumbnail depicted a man engaging in sex with a small figure. Defendant stated he sent that video to the UC because he thought the UC would like the video, and it would prove to the UC that the defendant had similar interests. During the interview the defendant asked for a lawyer, and the interview ended.

21.     A subpoena return from KIK revealed the IP Address used at the time ADLER communicated with the UC on January 2, 2018 were subscribed to the Subject Premises. The KIK return also revealed that an iPhone had been registered to the KIK account. The iPhone was used to transmit child pornography through internet located on the Subject Premises.

22.     During the course of the chat with the UC, the defendant stated that he may have images of the 8 year old cousin that he claimed to have sexually abused on his computer.

23.     On January 4, 2018, Witness 1 (W1), an individual with a close relationship with defendant and who resides inside of the Subject Premises, stated to law enforcement the defendant did in fact have a MacBook Pro computer, and that computer was presently located at Subject Premises in the room in which the defendant shared with W1.

24.     A MacBook Pro is capable of storing child pornography and other evidence that the defendant solicited, received, produced, and/or distributed child pornography. Additionally, a MacBook Pro can be used to back up the contents of the Apple iPhone that was used to store and transmit the child pornography that the defendant distributed to the UC. The

MacBook Pro may also contain passwords that can assist in accessing the Apple iPhone that was seized.

25.     W1 indicated that four other individuals reside at the home with the defendant and W1.  The residence has a basement, main level, and upstairs.  W1 stated the house has three bedrooms upstairs and a finished basement in which two individuals reside.  The defendant resides in a room in the upstairs portion of the residence with W1, and W1 last observed the laptop in that room.

26.     Because the defendant boasted of having multiple links containing videos of child pornography and stated that he may have images of the 8 year old cousin he claimed to have sexually abused on his computer, there is probable cause to believe that the Subject Premises listed in *Attachment A*, contains electronic storage mediums, which are capable of storing such information, that contain images and videos of child pornography and/or evidence that ADLER solicited, received, produced, and/or distributed child pornography.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

27.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the Subject Premises in the room W1 identified as belonging to ADLER and any other common area on the Subject Premises, in whatever form they are found where items identified by the residents of the Subject Premises as belonging to ADLER may be found.  One form in which the records might be found is data stored on a computer's hard drive or on other electronic storage media or digital devices.  As used herein, the terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication

devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of electronic storage media and digital devices or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

28.   *Probable Cause.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that if electronic storage media or digital devices identified as belonging to ADLER are found on the Subject Premises, there is probable cause to believe that the records and information described in Attachment B will be stored in the electronic storage media and digital devices for at least the following reasons:

    a.   Based upon my training and experience as well as my discussions with others involved in child pornography investigations, computers and computer technology have revolutionized the way in which child pornography is produced, distributed, received and possessed.

    b.   Individuals who engage in online criminal activity, including Possessing, Receiving or Distributing Child Pornography in violation of Title 18 USC Sections 2252 and 2252A, utilize the internet and computers to allow them to obtain the material in relatively secure and anonymous way. Individuals who have a sexual interest in child or images of children often maintain their collections that are in a digital or electronic format

in a safe, secure and private environment, such as a computer or flash drive.   These collections are often maintained for several years and are kept close by, usually at the collector's residence.   Individuals with a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

c.       Individuals who engage in the foregoing criminal activity, in the event that they change computers, will often "back up" or transfer files from their old computers' hard drives to that of their new computers, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

d.       Computer, smart phone, and other digital device files, or remnants of such files, can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet.   Electronic files downloaded to an electronic storage medium can be stored for years at little or no cost.   Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.   When a person "deletes" a file on a digital device such as a home computer or a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the electronic storage medium until it is overwritten by new data.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the electronic storage medium that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of

21

time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from an electronic storage medium depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

29.   *Forensic Evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on electronic storage media and digital devices in the Subject Premises because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence

23

of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

      c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

      f.     I know that when an individual uses a digital device to possess, receive or distribute child pornography, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the

crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

30.     *Methods To Be Used To Search Digital Devices.*  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals, specialized equipment, and software programs necessary to conduct a thorough search. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises. Smart phones capable of storing 64 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain enormous amounts of data.

d.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

e.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

f.      Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

g.      Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content,

and software applications that cannot be anticipated in advance of the forensic examination of the media or devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

h. In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1. Upon securing the Subject Premises, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any electronic storage media or digital devices, as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such electronic storage media or digital devices at the Subject Premises. The electronic storage media and digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel in order to extract and seize the information, records, or evidence described in Attachment B.

2. The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous

29

to looking at the outside of a file cabinet for the markings it contains and opening

a drawer believed to contain pertinent files); conducting a file-by-file review by

"opening," reviewing, or reading the images or first few "pages" of such files in

order to determine their precise contents; "scanning" storage areas to discover and

possibly recover recently deleted data; scanning storage areas for deliberately

hidden files; and performing electronic "keyword" searches through all electronic

storage areas to determine whether occurrences of language contained in such

storage areas exist that are related to the subject matter of the investigation.

3.     In searching the seized electronic storage media or digital devices,

the forensic examiners may examine as much of the contents of the electronic

storage media or digital devices as deemed necessary to make a determination as to

whether the contents fall within the items to be seized as set forth in Attachment B.

In addition, the forensic examiners may search for and attempt to recover "deleted,"

"hidden," or encrypted data to determine whether the contents fall within the items

to be seized as described in Attachment B.  Any search techniques or protocols used

in searching the contents of the seized electronic storage media or digital devices

will be specifically chosen to identify only the specific items to be seized under this

warrant.

## CONCLUSION

31.     Based on the above information, there is probable cause to believe that (1) ADLER

distributed child pornography from a device connected to the Internet from Subject Premises to

violate Title 18, United States Code, Sections 2252(a) and 2252A(a), (2) ADLER retains a

computer at the Subject Premises that ADLER stated may contain images of an 8 year old cousin

he claimed to have sexually abused, and (3) the fruits, evidence, contraband and instrumentalities of these offenses, described in Attachment B are located at the Subject Premises.

32.     Based upon the foregoing, I respectfully request that this Court issue a search warrant for the Subject Premises, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

Respectfully submitted,

Laura R. Calvillo
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this ___ day of January, 2018.

Honorable Deborah A. Robinson
United States Magistrate Judge



31